**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| In re Precision Lighting & Electric, LLC,<br><br>Debtor. | ) | Case No. 26-xxxxx<br>Chapter 11 |
| In re Geise Properties 5, LLC,<br><br>Debtor. | ) | Case No. 26-xxxxx<br>Chapter 11 |

**DECLARATION OF TARA GEISE IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Tara Geise ("Declarant"), of full age, pursuant to 28 U.S.C. §1746 and NECivR 7.1(a)(2)(C), declares under penalty of perjury:

1. I am above 18 years of age, and I am competent to testify.

2. I am the owner of Precision Lighting & Electric, LLC ("Precision") and of its affiliate, Geise Properties 5, LLC ("Geise Properties," and together with Precision, the "Debtors"), each of which is a debtor before this Court. I am also involved in the day-to-day management of each Debtor. In my capacity as owner and manager of the Debtors, I am familiar with each Debtor's day-to-day operations, business and financial affairs, and books and records and I have personal knowledge of the same.

3. I submit this declaration to assist this Court and parties in interest in understanding the circumstances that compelled the commencement of the Debtors' chapter 11 cases (the "Chapter 11 Cases") and in support of:

a. *Debtors' Joint Emergency Motion for Orders (I) Authorizing Postpetition Financing; (II) Granting Liens to Postpetition Lender; and (III) Scheduling Final Hearing (the "DIP Motion");*

*b. Debtors' Joint Emergency Motion For Orders Authorizing Debtors To Use Cash Collateral And Granting Adequate Protection Pursuant To Sections 361 And 363 Of The Bankruptcy Code And To Schedule A Final Hearing (the "Cash Collateral Motion");*

*c. Precision's Emergency Motion for Authority to (I) Pay Prepetition Employee Obligations, (II) Continue Administration of Employee Benefit Plans, and (III) Direct All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations (the "Wages Motion");*

d. *Precision's Motion for Entry of an Order: (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices and (II) Deeming the Utility Companies Adequately Assured of Payment (the "Utilities Motion"); and*

e. *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").*

4. Unless otherwise stated herein, this declaration is based upon my personal knowledge, input by the Debtors' employees and consultants, my review of relevant documents and information concerning the Debtors' operations and/or my opinions based on my experience and knowledge.

The Debtors

5. Precision was established in 2006 by Shane Geise. Precision's operational headquarters is located at 13401 S 234th St., Gretna, NE 68028, which property is leased by Precision from, and owned by, Geise Properties.

6. Geise Properties was formed in 2024 and owns the real property located at 13401 S 234th St., Gretna, NE 68028 (the "Headquarters Property"). In addition to serving as Precision's operational headquarters, the Headquarters Property is my primary residence.

7. Precision employs approximately 60 individuals who perform a wide variety of electrical and lighting services ranging from simple residential repair jobs to multimillion dollar commercial projects. As of the Petition Date, Precision has more than 40 active projects with adjusted contract prices aggregating to more than $12,500,000.00, and Precision continues to operate and bid out new jobs in the ordinary course of business.

Events Leading to Bankruptcy

8. Precision began to experience cash flow issues resulting from two primary facts. First, in 2025, Precision's former owner was arrested and ultimately incarcerated for matters unrelated to Precision or its operations. Ancillary to this incarceration, a divorce proceeding was commenced, and a decree was entered that, among other things, transferred ownership of Precision and Geise Properties to me. Historically, I did not participate in the operations of Precision, but I have spent the last year stepping into an ownership and operational role, which has required me not only to learn the operations of Precision as a going concern, but also to investigate and understand Precision's prior operations and financial condition.

9. Second, and contemporaneously with the foregoing, it was ascertained that a now former employee of Precision dramatically underbid several contracts, including two, multimillion dollar projects, resulting in substantial losses to Precision. These losses placed a tremendous burden on Precision's cash flow and borrowing capacity. In turn, Precision began having difficulties paying its operating expenses and suppliers, resulting in a much larger than normal accounts payable debt. Compounding this problem is a difficulty in collecting accounts receivable fast enough to bridge the gap between Precision's operational expenses and income, arising in part from customers (i) not

timely, or not at all, remitting payments on invoices and (ii) requiring two-party checks between Precision and one or more of its suppliers.

10. More recently, one of Precision's largest suppliers sent what Precision believes to be misleading or incorrect notices of rights to assert construction liens under Neb. Rev. Stat. § 52-135 to a number of Precision's customers. These notices have caused additional confusion and collection issues.

11. Understanding that Precision would not be able to operate in the long term under these circumstances, Precision and Geise Properties explored their options to sell their assets as a going concern, garnering interest from multiple parties. Ultimately, the Debtors reached an agreement to sell their respective assets as a going concern to Copper and Current, LLC ("Copper"), which requires a sale approved by this Court free and clear of liens, claims and encumbrances under § 363(f). The Debtors therefore found it necessary to commence the Chapter 11 Cases.

DIP Motion

12. I am familiar with the facts, content and substance of the DIP Motion. Precision requires access to working capital to bridge the gap between income and expenses while the sale process occurs. Copper has agreed to provide the Debtors with a debtor-in-possession loan (the "DIP Financing") to the extent necessary to fund Precision's ongoing operations on the terms set forth in the Debtor-In-Possession Credit Agreement attached to the DIP Motion (the "DIP Agreement").

13. Although Precision is the operating entity that will use the DIP Financing, both Debtors are borrowers under the DIP Agreement and each is offering different collateral. Precision will grant Copper a first-priority lien on certain unencumbered vehicles, a priming lien on its accounts, and a junior lien on its other encumbered property. Geise Properties will grant Copper a junior lien on the Headquarters Property, subordinate to the existing deeds of trust and assignments of rents held by Dayspring Bank (the "Bank"). Geise Properties benefits from the DIP Financing because Precision is its tenant at the Headquarters Property and the proposed sale to Copper includes the assets of both Debtors.

14. As described in the DIP Motion, the Debtors seek authority to borrow funds from Copper on a revolving line of credit of up to $300,000.00, subject to the budget attached to the DIP Motion.

15. As of the Petition Date, Precision lacks sufficient working capital to fund ongoing operations pending the completion of the sale process with Copper. As a result, Precision has a critical need for immediate access to the financing provided under the DIP Agreement. These funds will be used to meet Precision's weekly payroll obligations, fund the necessary expenses for Precision to provide the goods and services required under its contracts with customers, pay monthly insurance premiums, and pay other operational expenses. Without immediate access to such financing, Precision will not be able to operate its business. A cessation of operations would lead to a collapse of Precision's going concern value and endanger the contemplated sale to Copper. Such a result would be disastrous to the Debtors' creditors and to Precision's customers and employees.

16. The Debtors discussed the possibility of obtaining post-petition financing from their primary prepetition lender, the Bank, but the Bank is currently unable to offer the Debtors post-petition financing. In addition, the Bank is agreeable to the Debtors granting Copper certain super-priority claims, junior, and priming liens on specific assets of the Debtors as described in the DIP Agreement. Based on my conversations with the Bank, the Bank is unwilling to allow the Debtors to grant priming liens on substantially all of their assets to any possible lender, which I understand is typically a requirement for a lender to fund a Debtor in bankruptcy. As a result, I do not believe that the Debtors are able to obtain post-petition financing on terms more favorable than those proposed by Copper from any other party at this time.

17. The DIP Agreement was negotiated in good faith and at arm's length. I believe that the DIP Financing will allow Precision to operate as a going concern pending the anticipated sale process, which is designed to maximize the value of the bankruptcy estates for their creditors. The proposed DIP Financing is fair and reasonable and reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. In addition, to the best of my knowledge, Copper is not an insider or affiliate of Precision, Geise Properties, or myself, and neither I nor any of the Debtors' officers hold an interest in Copper. Copper was represented by separate counsel throughout the negotiation of the DIP Agreement.

18. Further, the Debtors, Copper, and the Bank have reached an agreement regarding the DIP Financing and use of Cash Collateral and it is my understanding the Bank has consented to the priming lien on Precision's Accounts granted to Copper under §364(d), and to the Debtors' use of Cash Collateral, on the terms to be set forth in the interim orders thereon.

19. I understand that the DIP Agreement purports to grant Copper a lien on certain vehicles owned by Precision that are otherwise unencumbered as described therein. I have reviewed the titles on these vehicles, which are in Precision's possession, and there do not appear to be any liens notated on said titles.

Cash Collateral Motion

20. I am familiar with the facts, content and substance of the Cash Collateral Motion.

21. The Debtors have a critical need for the immediate use of Cash Collateral. Without the immediate use of Cash Collateral, Precision will not be able to operate its business. A cessation of operations would lead to a collapse of the going concern value of Precision's enterprise. Such a result would be disastrous to all of the Debtors' creditors and to Precision's customers and employees.

22. I also believe that use of Cash Collateral will allow Precision to operate as a going concern pending the sale process, which will be designed to maximize the value of the bankruptcy estates for the Debtors' creditors. The proposed use of Cash Collateral is fair and reasonable and reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties. Further, the Debtors believe that the adequate protection proposed in the Cash Collateral Motion will preserve the value of the Bank's pre-petition collateral.

23. To my knowledge, the Bank is the only entity that may assert an interest in either Debtor's Cash Collateral.

24. The budget attached to the Cash Collateral Motion, which is the same budget as attached to the DIP Motion, was prepared by the Debtors under my supervision from the Debtors' books and records, and I believe it is reasonable and represents the Debtors' projected income and expenses.

25. Precision's revenue comes from its ongoing projects and the collection of its accounts receivable. Precision needs to use Cash Collateral to pay payroll, materials, insurance, vehicle and equipment costs, and other ordinary operating expenses. Without interim use of Cash Collateral, Precision will be unable to make payroll on November 13, 2026, and will be forced to cease operations, which would destroy its going concern value and the contemplated sale to Copper.

26. Geise Properties' revenue consists of rent paid by Precision under its lease of the Headquarters Property, which rents are subject to the Bank's assignments of leases and rents. Geise Properties needs to use Cash Collateral to pay real estate taxes, insurance, and maintenance on the Headquarters Property and its regular monthly payment to the Bank on Loan No. 20240827, as set forth in the budget.

Employee Wages Motion

27. I am familiar with the facts, content and substance of the Wages Motion.

28. Precision employs approximately 60 employees, whom Precision pays on a weekly basis. Without a sufficient labor force, Precision's business would come to a halt.

29. As of the Petition Date, Precision will owe its employees for unpaid gross wages, salaries, taxes (including, but not limited to withholding taxes), and deductions (including, but not limited to, health insurance, garnishments, etc.). These amounts are attributable to pre-petition employment and are hereinafter referred to as the "Prepetition Wages." A true and correct breakdown of the amounts owed by Precision to its employees is attached to the Wages Motion as Exhibit A.

30. Precision routinely withholds from Prepetition Wages amounts that Precision is required to remit to various federal, state and local taxing authorities and other governmental agencies (the "Employment and Withholding Taxes"). Examples of such withholdings include Social Security taxes, federal, state and local income taxes, wage garnishments and other court-ordered deductions. These taxes and other deduction obligations are usually calculated based on statutorily mandated percentages of earned wages.

31. Precision also offers its employees certain benefits, including without limitation health insurance, dental insurance, and a 401(k) program. Precision requests authority to continue these benefits in the ordinary course of business and pay certain prepetition obligations related thereto.

32. The relief requested in the Wages Motion represents a sound exercise of Precision's business judgment, is necessary to avoid immediate and irreparable harm, and is warranted in Precision's case. Precision has reached this conclusion by weighing the costs of fulfilling the Prepetition Wages against the benefits of retaining employees and the difficulty in finding

replacement employees willing to work for an entity in Chapter 11, as well as the possible disruption to Precision's customers and active projects.

33. Absent an order granting the relief requested, Precision's employees will undoubtedly suffer hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of Precision's employees to meet their own personal financial obligations. Without the requested relief, the stability of Precision will be greatly impacted by the possibility that the affected employees will seek alternative employment.

34. As such, I believe it is in the best interests of Precision's estate and the creditors thereof to grant the relief requested in the Wages Motion in order to allow Precision to pay the Prepetition Wages, subject to the terms of the orders sought in the DIP Motion and the Cash Collateral Motion, and the budget submitted therewith, so that it may ensure the retention of Precision's employees and the maintenance of Precision's normal business operations without further interruption. In the event Precision is unable to pay its employees as requested, the potential harm resulting from the loss of employees, or loss in employee-employer relations, could have a serious impact on Precision's ability to maintain operations.

35. Thus, the payment of these Prepetition Wages is necessary to the retention of Precision's employees and is thus essential to the preservation of Precision's going concern value. Without the relief requested in the Wages Motion, Precision's ability to maintain its operations will be substantially impeded.

<u>Utilities Motion</u>

36. I am familiar with the facts, content and substance of the Utilities Motion. In connection with the operation of its business, Precision obtains utility services from the utility companies identified in the Utilities Motion (the "Utility Companies"). Precision is current on its obligations owed to the Utility Companies as of the Petition Date.

37. Uninterrupted utility services are essential to Precision's ongoing business operations. Should any Utility Company refuse or discontinue service, even for a brief period, Precision's operations would be severely disrupted, jeopardizing Precision's ability to perform its contracts and preserve its going concern value. Precision proposes to pay each Utility Company's invoices as they come due in the ordinary course, subject to the budget submitted with the DIP Motion, and I believe this provides the Utility Companies with adequate assurance of future payment.

<u>Joint Administration Motion</u>

38. I am familiar with the facts, content and substance of the Joint Administration Motion. Precision and Geise Properties are under common ownership and management, Precision operates substantially all of the property of Geise Properties under a lease, the Bank is the primary prepetition lender to both, and the proposed sale to Copper involves the assets of both. Accordingly, many of the motions, hearings, and orders in the Chapter 11 Cases will affect both Debtors, and I believe joint administration will reduce fees and costs by avoiding duplicative filings without harming the substantive rights of any party in interest.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 11th day of November, 2026.

/s/ *Tara Geise*
Tara Geise